REDACTED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| MANNY'S AUTO SUPPLY, INC. and IRVING LEVINE AUTOMOTIVE DISTRIBUTORS, INC., on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>TENNECO, INC., TENNECO GMBH, and TENNECO AUTOMOTIVE OPERATING CO., INC.,<br><br>     Defendants. | Docket No. 18-cv-12166 |

## CLASS ACTION COMPLAINT

Plaintiffs Manny's Auto Supply, Inc. and Irving Levine Automotive Distributors, Inc., individually and on behalf of a proposed class of direct purchasers of Automotive Exhaust Systems, bring this class action against Defendants under the federal antitrust laws for treble damages and allege as follows.

## NATURE OF THE CASE

1.     Beginning at least as early as January 1, 2002, the Defendants and their co-conspirators—United States and global manufacturers and suppliers of Automotive Exhaust Systems —violated the antitrust laws by entering into a continuing conspiracy to rig bids and fix, raise, maintain, or stabilize prices of Automotive Exhaust Systems sold in the United States and elsewhere at supra-competitive levels.  As a result of this unlawful conduct, Plaintiffs and other Class members paid artificially inflated prices for Automotive Exhaust Systems and have suffered antitrust injury to their business or property.

REDACTED

2.      On March 25, 2014, European Commission antitrust regulators raided the offices of several Automotive Exhaust Systems makers, including some of the defendants in this case, as part of their investigation into possible collusion between manufacturers of exhaust systems. One of the defendants in this case has received a subpoena from the U.S. Department of Justice.

3.      Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 (the "Sherman Act") and Section 4 of the Clayton Act, 15 U.S.C. § 15 (the "Clayton Act"), and assert the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiffs, which are based upon personal knowledge.  Plaintiffs' information and belief are based upon, *inter alia*, the investigation made by their attorneys.

## DEFINITIONS

4.      "Automotive Exhaust Systems" are defined as one or more of the following: manifolds, flex pipes, catalytic converters, converters, diesel oxidation catalysts, diesel particulate filters, oxygen sensors, isolators, gaskets, clamps, resonator assemblies, pipe accessories, mufflers, muffler assemblies, and tubes.  An exhaust system has a "hot end," which is the part of the exhaust system that is mounted to the engine (generally comprising the manifold and/or catalytic converter) and a "cold end," which is the part of the exhaust system that is mounted to the underbody of the car (and contains, for example, the muffler, pipes and/or the catalytic converter).

5.      The "Class Period" is from at least as early as January 1, 2002 to February 12, 2018.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this action to recover treble damages, costs of suit, and reasonable attorneys' fees resulting from Defendants' and their co-conspirators' violations of the Sherman Act, 15 U.S.C. § 1.

REDACTED

7.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

8.      Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, are found in, or transact business in this District.

9.      The activities of Defendants and their co-conspirators were within the flow of and were intended to and did have a substantial effect on, the interstate commerce of the United States.

10.     This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District, (b) manufactured, sold, shipped, and delivered substantial quantities of Automotive Exhaust Systems throughout the United States, including in this District, (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this District.

### THE PARTIES

*Plaintiffs*

11.     Plaintiff Manny's Auto Supply, Inc. ("Manny's Auto Supply") is a Connecticut corporation with its principal place of business in Connecticut.  Manny's Auto Supply purchased

REDACTED

Automotive Exhaust Systems directly from one or more of the Defendants or their co-conspirators during the Class Period.

12. Plaintiff Irving Levine Automotive Distributors, Inc. ("Irving Levine") is a Connecticut corporation with its principal place of business in Danbury, Connecticut. Irving Levine purchased Automotive Exhaust Systems directly from one or more of the Defendants or their co-conspirators during the Class Period.

*Defendants*

13. Defendant Tenneco Inc. is a Delaware corporation and manufacturer of Automotive Exhaust Systems with its principal place of business in Illinois. Tenneco Inc.— directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

14. Defendant Tenneco Automotive Operating Co., Inc., is a Delaware corporation and manufacturer of Automotive Exhaust Systems with its principal place of business in Illinois. It is a subsidiary of and wholly owned and/or controlled by its parent, Tenneco Inc. Tenneco Automotive Operating Co., Inc., sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

15. Defendant Tenneco GmbH is a German company and manufacturer of Automotive Exhaust Systems with its principal place of business in Germany. Tenneco GmbH is a subsidiary of and wholly owned and/or controlled by its parent, Tenneco Inc. Tenneco GmbH sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period. Tenneco Inc., Tenneco Automotive Operating Co., Inc., and Tenneco GmbH are referred to collectively in this Complaint as "Tenneco" or "Defendants".

REDACTED

## DEFENDANTS' CO-CONSPIRATORS

*Bosal*

16.     Bosal Nederland, B.V. is a Dutch company with its principal place of business in the Netherlands.  Bosal Nederland, B.V.—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

17.     Bosal Industries-Georgia, Inc. is a manufacturer of Automotive Exhaust Systems with its principal place of business in Michigan.  Bosal Industries-Georgia, Inc. operates under the assumed name Bosal International North America and is the North American headquarters of Bosal Nederland, B.V.  Bosal Industries-Georgia is a subsidiary of and wholly owned and/or controlled by its parent, Bosal Nederland, B.V.  Bosal Industries-Georgia, Inc. sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities were under the control and direction of Bosal Nederland, B.V.

18.     Bosal USA, Inc. is a manufacturer of Automotive Exhaust Systems with its principal place of business in New Jersey.  Bosal USA, Inc. is a subsidiary of and wholly owned and/or controlled by its parents, Bosal Nederland, B.V. and/or Bosal Industries Georgia, Inc.  Bosal USA, Inc. sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.  Bosal Nederland, B.V., Bosal Industries-Georgia, Inc. and Bosal USA, Inc. are referred to collectively in this Complaint as "Bosal."

*Boysen*

19.     Friedrich Boysen GmbH & Co. KG (hereinafter, "Boysen") is a company with its principal place of business in Germany.  Boysen—directly or through its subsidiaries, which it

REDACTED

wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

*Eberspacher*

20.     Eberspacher Exhaust Technology GmbH & Co. KG is a company with its principal place of business in Germany.  Eberspacher Exhaust Technology GmbH & Co. KG—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

21.     Eberspacher North America, Inc. is a manufacturer of Automotive Exhaust Systems with its principal place of business in the Eastern District of Michigan.  Eberspacher North America, Inc.—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.  Eberspacher Exhaust Technology GmbH & Co. KG and Eberspacher North America, Inc. are referred to collectively in this Complaint as "Eberspacher."

*Faurecia*

22.     Faurecia SA is a French company with its principal place of business in France.  Faurecia SA—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

23.     Faurecia Emissions Control Technologies, USA, LLC ("Faurecia Emissions Control") is a manufacturer of Automotive Exhaust Systems with its principal place of business in Indiana.  Faurecia Emissions Control is a subsidiary of and wholly owned and/or controlled by Faurecia SA.  In 2004, EMCON Technologies, LLC ("EMCON") acquired the Exhaust Systems

REDACTED

Business of ArvinMeritor, Inc.  In 2009, Faurecia, SA acquired EMCON, and EMCON became Faurecia Emissions Control.  Faurecia Emissions Control—directly or through its subsidiaries, which it wholly owned or controlled—sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

24.     Faurecia Exhaust Systems, Inc. is a manufacturer of Automotive Exhaust Systems with its principal place of business in Ohio.  Faurecia Exhaust Systems, Inc. sold Automotive Exhaust Systems that were purchased in the United States, including in this District, during the Class Period.

25.     Faurecia SA, Faurecia Emissions Control Technologies, USA, LLC and Faurecia Exhaust Systems, Inc. are referred to collectively in this Complaint as "Faurecia."

*Meritor*

26.     Meritor, Inc. f/k/a ArvinMeritor (hereinafter, "Meritor"), is an Indiana company with its headquarters in Troy, Michigan.  In 2004, EMCON acquired the Exhaust Systems business of ArvinMeritor, Inc.  Upon information and belief, ArvinMeritor, Inc. (currently known as Meritor, Inc.) retained some or all of the liabilities of the Exhaust Systems business sold to EMCON.  Meritor, Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—sold Exhaust Systems that were purchased throughout the United States, including in this District, during the Class Period.

27.     The acts alleged in this Complaint to have been done by Tenneco and its co-conspirators were authorized, ordered, and condoned by their respective parent companies.

28.     The acts alleged in this Complaint to have been done by Tenneco and its co-conspirators were authorized, ordered, and performed by their officers, directors, agents,

REDACTED

employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

29.     Bosal, Boysen, Eberspacher, and Faurecia (collectively, the "Co-Conspirators") have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants and Co-Conspirators are jointly and severally liable for the acts of the Co-Conspirators whether named or not named as defendants in this Complaint.

30.     Each Defendant and Co-Conspirator acted as a principal or an agent of or for the other Defendants and Co-Conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint.

## INTERSTATE TRADE AND COMMERCE

31.     The activities of Defendants and the Co-Conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

32.     During the Class Period, Defendants and the Co-Conspirators manufactured, sold, and shipped substantial quantities of Automotive Exhaust Systems in a continuous and uninterrupted flow of interstate and foreign commerce.

## AUTOMOTIVE EXHAUST SYSTEMS

33.     Automotive Exhaust Systems manufactured, distributed or sold by Defendants and the Co-Conspirators during the Class Period are not functionally distinguishable from each other in any material respect.

34.     Automotive Exhaust Systems are installed by motor vehicle original equipment manufacturers ("OEMs") in new motor vehicles as part of the manufacturing process.  They are also installed in motor vehicles to replace worn out, defective, or damaged Automotive Exhaust Systems.

REDACTED

35.     OEMs include the Big Three in Detroit (General Motors, Ford, and Fiat Chrysler) and non-domestic companies that also operate manufacturing plants in the United States.  For example, during the Class Period, Nissan manufactured motor vehicles in Mississippi and Tennessee, Toyota in Kentucky, BMW in South Carolina, Honda in Ohio and Alabama, Hyundai and Mercedes-Benz in Alabama, and Kia in Georgia.  In addition to OEMs, distributors, such as Plaintiffs, and others purchased Automotive Exhaust Systems directly from Defendants and the Co-Conspirators.

36.     When purchasing Automotive Exhaust Systems, OEMs issue Requests for Quotation ("RFQs") to motor vehicle parts suppliers.  For automotive OEMs, the bidding process begins approximately three years prior to the start of production of a new model platform.  In response, motor vehicle parts suppliers submit quotations or bids and the OEM usually awards the business to the selected motor vehicle part supplier for the anticipated production cycle of the platform, usually four to six years.  Japanese OEMs procure parts for U.S.-manufactured motor vehicles both in Japan and the United States.

37.     Defendants and the Co-Conspirators supplied Automotive Exhaust Systems to OEMs for installation in motor vehicles manufactured and sold in the United States and elsewhere.  Defendants and the Co-Conspirators manufactured Automotive Exhaust Systems (a) in the United States for installation in motor vehicles manufactured and sold in the United States, (b) outside of the United States for export to the United States and installation in motor vehicles manufactured and sold in the United States, and (c) outside the United States for installation in motor vehicles manufactured outside the United States for export to and sale in the United States.

38.     During the Class Period, Defendants and the Co-Conspirators sold Automotive Exhaust Systems directly to OEMs, suppliers to OEMs, distributors, and other purchasers.

REDACTED

39.     During the Class Period, Defendants and the Co-Conspirators, who in a competitive market would be horizontal competitors, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Automotive Exhaust Systems.  As a result of their unlawful conduct, Defendants and the Co-Conspirators did not compete, but instead conducted their business insulated from competition.

## THE CHARACTERISTICS OF THE MARKET FOR AUTOMOTIVE EXHAUST SYSTEMS ARE CONDUCIVE TO COLLUSION

40.     Several important economic characteristics of the market for Automotive Exhaust Systems render it plausible that there was collusion among Automotive Exhaust Systems suppliers.

### *Market Concentration*

41.     The market for Automotive Exhaust Systems is highly concentrated.  As of 2013 just five companies—including Defendants and the Co-Conspirators—controlled about 75% of the global market for Automotive Exhaust Systems.

### *High Barriers to Entry*

42.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing.  New entrants would, in turn, decrease the market power of the conspirators and diminish their ability to successfully maintain supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Therefore, high barriers to entry help facilitate a cartel.

43.     There are high barriers to entry in the market for Automotive Exhaust Systems. Entry requires a company to incur significant start-up capital expenditures.  A new entrant into the business would have to incur millions of dollars in costs, including capital expenditures on

10

REDACTED

plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor.  A new entrant would also have to have assured relationships with significant customers in order to justify its substantial investments of capital.

*Price Inelasticity*

44.    When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic.   Otherwise, increased prices would result in declining sales, revenues, and profits.

45.    Automotive Exhaust Systems are required for vehicles that use internal combustion engines; there are no viable substitute products.  Therefore, pricing for Automotive Exhaust Systems is highly inelastic.

*Opportunities for Collusion*

46.    Defendants and the Co-Conspirators attended industry events that created opportunities to conspire.  Such industry events have provided myriad opportunities to meet, conspire, and share information.

**DEFENDANTS' AND CO-CONSPIRATORS' ANTITRUST CONSPIRACY**

47.    During the Class Period, Defendants and the Co-Conspirators conspired to rig bids for, to allocate the supply of, and to raise, fix and maintain prices for Automotive Exhaust Systems sold in or into the United States.

48.    Defendants and the Co-Conspirators engaged in anticompetitive conduct in furtherance of the alleged conspiracy.

49.    ███████████████████████████████████████████

███████████████████████████████████████████████

REDACTED

50.

51.

52.

53.

54.

55.

REDACTED

56.     Defendants and the Co-Conspirators participated in these and other meetings, conversations, and communications to discuss bids and price quotations for Automotive Exhaust Systems sold in or into the United States.

57.     Defendants and the Co-Conspirators agreed during their meetings, conversations, and communications to allocate among themselves the supply of Automotive Exhaust Systems sold in or into the United States.

58.     Defendants and the Co-Conspirators sold Automotive Exhaust Systems to customers in the United States and elsewhere at collusive and non-competitive prices.

59.     Defendants and the Co-Conspirators accepted payments for Automotive Exhaust Systems sold in the United States and elsewhere at collusive and non-competitive prices.

60.     Defendants and the Co-Conspirators agreed during their meetings, conversations, and communications to coordinate price adjustments requested by motor vehicle manufacturers.

61.     Defendants and the Co-Conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers in the United States and elsewhere in accordance with their conspiratorial agreements.

62.     Defendants and the Co-Conspirators held meetings and conversations to monitor and police their bid-rigging and price-fixing conspiracy.

63.     Defendants and the Co-Conspirators affirmatively undertook measures to conceal their unlawful conduct.

64.     Defendants and the Co-Conspirators accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.

65.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (1) the OEM issues the RFQ to multiple

REDACTED

parts suppliers; (2) the suppliers submit bids; (3) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing; (4) the suppliers submit revised bids; and (5) the OEM selects the winner.

66.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

67.     When OEMs purchase Automotive Exhaust Systems directly from the supplier to whom they awarded the contract, the OEMs purchase the Automotive Exhaust Systems at the winning price.

68.     That winning price is also used when OEM suppliers that were not part of the RFQ process purchase Automotive Exhaust Systems directly from the winning bidder for incorporation into products manufactured for and sold to OEMs.  Those suppliers and other direct purchasers who directly purchase Automotive Exhaust Systems from the winning bidder pay the winning bidder at least the winning price.  The OEM price sets the floor for pricing of Automotive Exhaust Systems.

69.     Defendants' and the Co-Conspirators' conduct persisted for at least nine years (2002-2011).  Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that the conspiracy would have continued undetected.

70.     Among other conduct, Defendants and the Co-Conspirators manipulated the RFQ process to accomplish their conspiracy.

71.     As part of their conspiracy, at times Defendants and the Co-Conspirators agreed to submit bids that would allow the supplier that had the existing Automotive Exhaust Systems

REDACTED

business for a particular model to win the Automotive Exhaust Systems business for the successor model.

72.     Defendants and the Co-Conspirators coordinated their Automotive Exhaust Systems pricing.  They submitted responses to RFQs that incorporated changes to pricing based on the conspiratorial agreements they made with each other.   They exchanged pricing information not just to ensure that the agreed-upon party would win the business, but also to ensure that the losing bidders would look competitive in order to have the opportunity to bid for future business.

73.     Defendants and the Co-Conspirators communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy.   These activities included, but were not limited to, the following:

a.     Agreeing to unlawfully coordinate pricing for, and allocate sales of, Automotive Exhaust Systems.  For example, in responding to RFQs, Defendants and the Co-Conspirators agreed that the incumbent supplier would be the preferred bidder, and to price their bids to effectuate this agreement.

b.     Colluding with regard to RFQs for Automotive Exhaust Systems business by agreeing on pricing and then communicating agreed-upon prices to Defendants' and the Co-Conspirators' subsidiaries in the United States, where the prices were submitted collusively.

c.     Discussing and exchanging pricing information with regard to Automotive Exhaust Systems RFQs and reaching conspiratorial agreements with respect to RFQs by means of communications on multiple occasions to coordinate responses and exchanges

REDACTED

and adjustments of Automotive Exhaust Systems pricing before submission to OEMs in the United States and elsewhere.

74.    Defendants and the Co-Conspirators knew and intended that their actions regarding their sales of Automotive Exhaust Systems to motor vehicle manufacturers would have a direct impact on prices for Automotive Exhaust Systems sold to all direct purchasers in the United States.

75.    Defendants' and the Co-Conspirators' single price-fixing conspiracy involving Automotive Exhaust Systems impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of Automotive Exhaust Systems.

## ANTITRUST INVESTIGATION

76.    In March 2014, Reuters reported that European Commission antitrust regulators had raided Tenneco, Faurecia, and several other Automotive Exhaust Systems makers as part of its investigation into price fixing in the global automotive parts industry.

77.    Bloomberg reported in March 2014 that Tenneco, Faurecia, and Eberspacher Group had been "raided by European Union antitrust regulators investigating possible collusion between manufacturers of car-exhaust systems."

78.    Reuters and Bloomberg also reported that Tenneco had received a related subpoena from the U.S. Department of Justice.

79.    Tenneco, Faurecia, and Eberspacher each acknowledged that they were under investigation.

80.    The European Commission announced its actions in a press release dated March 25, 2014, triggering public comment by the parties under investigation.

REDACTED

81.     That same day Tenneco released a statement in which it "confirmed . . . that authorities in Europe and the United States have requested information as part of an ongoing global antitrust investigation concerning multiple automotive suppliers," and acknowledged that "[r]epresentatives of the European Commission were at Tenneco GmbH's Edenköben, Germany administrative facility to gather information in connection with the investigation."

82.     Tenneco said it was "fully cooperating with the authorities."

83.     Faurecia and Eberspacher said the same.

84.     In a 10-Q filing with the Securities and Exchange Commission, Tenneco reported: "Antitrust law investigations and related matters often continue for several years and can result in significant penalties and liability.  At this point, we cannot estimate the ultimate impact on our company from investigations into our antitrust compliance and related matters in light of the uncertainties and many variables involved, and there can be no assurance that the ultimate resolution of these matters will not have a material adverse effect on our consolidated financial position, results of operations or liquidity."

## CLASS ACTION ALLEGATIONS

85.     Plaintiffs bring this action on behalf of themselves, and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as the representatives of a Class defined as follows:

> All individuals and entities who purchased Automotive Exhaust Systems in the United States directly from Defendants or their Co-Conspirators (or their subsidiaries or affiliates) from January 1, 2002 through February 12, 2018. Excluded from the Class are Defendants and their Co-Conspirators, their present and former parent companies, subsidiaries, and affiliates, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

> For purposes of the class definition, the following entities are "Co-Conspirators":  Bosal Nederland, B.V.; Bosal Industries-Georgia, Inc.; Bosal USA, Inc.; Friedrich Boysen GmbH & Co. KG; Eberspacher Exhaust Technology GmbH & Co. KG; Eberspacher

17

REDACTED

> North America, Inc.; Faurecia SA; Faurecia Emissions Control Technologies, USA, LLC; Faurecia Exhaust Systems, Inc.; and Meritor, Inc. (f/k/a ArvinMeritor).

86.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.  While the exact number of Class members is unknown to Plaintiffs, it is believed to be in the hundreds.  The identity of the members of the Class can be readily determined from information and records Defendants and the Co-Conspirators possess.

87.     Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct by Defendants and the Co-Conspirators, *i.e.*, they have paid artificially inflated prices for Automotive Exhaust Systems as a result of Defendants' and the Co-Conspirators' anticompetitive and unlawful conduct.

88.     Plaintiffs will fairly and adequately protect and represent the interests of the Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

89.     Plaintiffs are represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

90.     Questions of law and fact common to members of the Class predominate over questions that may affect only individual Class members, because Defendants and the Co-Conspirators have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' and the Co-Conspirators' anticompetitive and unlawful conduct.

REDACTED

91.     There are core questions of law and fact common to the Class, such as:

        a.      Whether Defendants and the Co-Conspirators conspired to fix, raise, maintain, or stabilize prices of, to allocate, or to rig bids for, Automotive Exhaust Systems;

        b.      Who participated in the conspiracy and how long it lasted;

        c.      Whether the conspiracy caused Automotive Exhaust Systems prices to be higher than they otherwise would have been;

        d.      Whether Defendants' and the Co-Conspirators' conduct caused injury to the business or property of Plaintiffs and members of the Class;

        e.      Whether Defendants' and the Co-Conspirators' conduct violated Section 1 of the Sherman Act;

        f.      Whether Defendants and the Co-Conspirators undertook actions to conceal their unlawful conspiracy; and

        g.      How to measure the damages suffered by the Class.

92.     A class action is superior to the other methods available for the fair and efficient adjudication of this litigation because individual joinder of all Class members is impracticable. Individual litigation presents the potential for inconsistent judgments and would greatly increase the cost and duration of litigation for all parties and for the judicial system.  A class action permits more efficient case management and offers the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

## ANTITRUST INJURY SUFFERED BY PLAINTIFFS AND THE CLASS

93.     Defendants' and the Co-Conspirators' anticompetitive conduct has had the following effects:

REDACTED

a.    price competition has been restrained, suppressed, or eliminated with respect to Automotive Exhaust Systems;

b.    the prices of Automotive Exhaust Systems have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

c.    purchasers have been deprived of free and open competition in the Automotive Exhaust Systems market.

94.    As a result of Defendants' and the Co-Conspirators' contract, combination, or conspiracy, Plaintiffs and other Class members paid higher prices for Automotive Exhaust Systems than they would have in the absence of the conspiracy, and Plaintiffs and other Class members have sustained injury to their business or property.

## PLAINTIFFS' CLAIMS ARE TIMELY

95.    Plaintiffs and other Class members had no knowledge of the anticompetitive conduct alleged herein.  It was on March 25, 2014 that the European Commission antitrust regulators announced that they were investigating price fixing in the Automotive Exhaust Systems industry.

96.    Plaintiffs and other Class members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date.

97.    No information about the Automotive Exhaust Systems conspiracy was in the public domain or otherwise available to Plaintiffs or the Class prior to March 25, 2014.  Until then there was no or insufficient information to suggest that Defendants and the Co-Conspirators were involved in an Automotive Exhaust Systems conspiracy.  For these reasons, the statute of

REDACTED

limitations as to Plaintiffs' and the Class's claims did not begin to run until (at the earliest) March 25, 2014.

98.     Fraudulent concealment by Defendants and the Co-Conspirators also tolled the statute of limitations on the claims asserted by Plaintiffs and the Class until at least March 25, 2014.   Defendants and the Co-Conspirators affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiffs and the Class, from at least as early as January 1, 2002 through at least March 2014.  During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to this Complaint.

99.     Before at least March 25, 2014, Plaintiffs and the Class were unaware of Defendants' and the Co-Conspirators' unlawful conduct and did not know before then that they were paying supra-competitive prices for Automotive Exhaust Systems during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs or other members of the Class that would have suggested that they were being injured by Defendants' and the Co-Conspirators' unlawful conduct.

100.    The affirmative acts by the Defendants and the Co-Conspirators alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

101.    By its very nature, Defendants' and the Co-Conspirators' anti-competitive conspiracy was inherently self-concealing.   Because Automotive Exhaust Systems are not exempt from antitrust regulation, Plaintiffs and the Class reasonably believed that the market for Automotive Exhaust Systems was competitive.

102.    Defendants and the Co-Conspirators represented publicly that their pricing and bidding activities were unilateral, rather than being based on anticompetitive agreements.   In making those false representations, Defendants and the Co-Conspirators misled Plaintiffs and the

REDACTED

Class as to the true, collusive, and coordinated nature of their bid-rigging, customer-allocation, and price-fixing activities.

103.   Defendants' and the Co-Conspirators' wrongful conduct was carried out in part through means and methods that were designed to prevent detection, and which for a long time succeeded in preventing detection.

104.   In particular, Defendants and the Co-Conspirators participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

105.   During these meetings, conversations, and communications, Defendants and the Co-Conspirators agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

106.   Defendants and the Co-Conspirators likewise agreed to allocate the supply of Automotive Exhaust Systems sold to customers in the United States and elsewhere on a model-by-model basis.

107.   Defendants and the Co-Conspirators also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

108.   In accordance with their agreements, Defendants and the Co-Conspirators submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

109.   Plaintiffs and the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and the Co-Conspirators to avoid detection of, and to fraudulently conceal, their conduct.

REDACTED

110.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Class's claims was tolled and did not begin to run until at least March 25, 2014.

## COUNT I: CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT

111.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth here.

112.    Defendants and the Co-Conspirators entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

113.    The acts done by each of the Defendants and Co-Conspirators as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' and the Co-Conspirators' affairs.

114.    Commencing at least as early as January 1, 2002 and continuing until the present, the exact dates being currently unknown to Plaintiffs, Defendants and the Co-Conspirators entered into a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Automotive Exhaust Systems, creating anticompetitive effects.

115.    Defendants' and the Co-Conspirators' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Exhaust Systems throughout the United States.

REDACTED

116.    As a result of the conspiracy alleged herein, the prices charged to Plaintiffs and the other members of the Class for Automotive Exhaust Systems were unlawfully raised, fixed, maintained, or stabilized in the United States.

117.    The conspiracy has had the following effects:

a.    prices paid by Plaintiffs and the Class for Automotive Exhaust Systems were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

b.    Plaintiffs and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Automotive Exhaust Systems; and

c.    competition in the market for Automotive Exhaust Systems has been unlawfully restrained, suppressed, or eliminated.

118.    As a direct and proximate result of Defendants' and the Co-Conspirators' unlawful conduct, Plaintiffs and the Class have been damaged, and will continue to be damaged, by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendants and the Co-Conspirators as alleged herein.

119.    The conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, and respectfully request the following relief:

A.    That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

REDACTED

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and the Co-Conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      That Plaintiffs and the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint-and-several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiffs and the Class receive such other or further relief as may be just and proper.

REDACTED

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

issues so triable.

Dated: July 10, 2018

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
FINK + ASSOCIATES LAW
38500 Woodward Avenue; Suite 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com
nfink@finkandassociateslaw.com.com

Gregory P. Hansel
Randall B. Weill
Michael S. Smith
PRETI, FLAHERTY, BELIVEAU
   & PACHIOS LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

REDACTED

Steven A. Kanner
William H. London
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Carl E. Person
225 E. 36th Street – Suite 3A
New York, N.Y. 10016-3664
Telephone: (212) 307- 4444
carlpers2@gmail.com

Irwin B. Levin
Scott Gilchrist
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com
sgilchrist@cohenandmalad.com

*Counsel for Plaintiffs Manny's Auto Supply, Inc.,
Irving Levine Automotive Distributors, Inc. and
the Proposed Class*